Filed 04/08/21

## STATE OF VERMONT

**SUPERIOR COURT**
Orleans Unit

**CIVIL DIVISION**
Docket No. 287-10-19 Oscv

**MARIE ZINKY**

v.

**GUARDIANSHIP OF IRENE POLLARD**

### DECISION
**Motions to Modify Guardianship and Change Residential Placement**

This case concerns the guardianship of Irene Pollard. She is presently under an involuntary guardianship and her guardian is Becky Gale. Irene Pollard's sisters Marie Zinky, Louise Schillinger, and Rita Parzych filed motions to terminate Becky Gale as guardian and replace her with one of the sisters and change her residential placement to Connecticut, where they live. The motions were denied in the Probate Division (Docket 51-2-16 Ospr) and this appeal ensued.

An evidentiary de novo hearing was held on March 18 and 30, 2021 by Webex. The three sisters were present remotely and represented by Attorney Shane K. Clark. Becky Gale was present by telephone and represented herself. Irene Pollard was unable to attend. She was represented remotely by Attorney Sara Davies Coe. Bonnie Shattuck, who served as her guardian ad litem, also participated remotely.

Based on the evidence, the court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

Irene Pollard is an older retired woman with dementia who is under guardianship. Her dementia became significant about 3 years ago, in 2018. She was one of five sisters who grew up in Connecticut, but she has lived in Vermont for many years. Prior to 2015, she lived with her husband in a mobile home in Brownington. Every year for many years she went to Connecticut for a two-week visit with her sisters and she also visited cousins in Rhode Island. Her last such visit was in July of 2015.

In November of 2015, her husband died. Her sister Marie offered to help her, but she declined and said, 'Becky would help.' Two weeks after his death, she moved in with her friend Becky Gale and Becky Gale's husband who also lived in a mobile home in Brownington. Irene

1

has lived with them since. She has her own bedroom. The Gales have two dogs, a cat, and outdoor livestock.

In 2016, Irene voluntarily made Becky Gale her guardian through the Probate Court. Her ability to be independent was declining, and on March 23, 2017, following an involuntary guardianship proceeding, Becky Gale became her guardian on an involuntary basis. There is no evidence that Irene Pollard herself was dissatisfied with this. She had chosen to live with Becky and seemed to be content with her. She attended an adult daycare program daily while Becky worked. Irene had a computer and used Facebook to communicate with her sisters and played games such as hearts and solitaire on her computer.

She and Becky enjoyed making trips to casinos to play slot machines. They took a bus, stayed in a hotel, and Irene generally played 50 cent slot machines. This is something they had done regularly since before Irene's husband's death. Irene did not risk very much money, and rarely won, but seemed to enjoy sharing the gambling trips with Becky as recreational outings. They shared travel and overnight expenses. Irene's funds were often used to pay 1/3 of such expenses. Becky testified that Irene spent approximately $100 per month on gambling. The bank statements through January of 2018 suggest that there were travel expenses in addition to that amount, but also that there was sufficient income for this cost.

Irene's sisters criticize Becky for taking her to casinos and allowing her funds to be used for gambling. They suspect that significant amounts of Irene's funds were spent on gambling. The evidence does not support that conclusion. The bank statements and testimony show that it was a modest recreational expense that Irene enjoyed and was part of a pattern that had been established some time prior to her husband's death. There is no evidence that funds were squandered on gambling. Rather, the amounts spent were comparable to costs for other forms of recreation and were within Irene's means. Irene's expenses and needs were being met out of her income.

Irene's income consisted solely of a little over $1,000 per month in social security through January of 2018. Becky filed annual accounts with the Probate Court in the spring of 2017 and again in the spring of 2018. She reported use of Irene's income for gambling trips as described above. Becky was paid $400 per month for room and board. Becky used Irene's funds to buy replacement computers when hers broke.

Becky understood that the mobile home in which Irene and her husband had lived together was owned by a third party who also owned the underlying land. The third party who owned the underlying land showed Becky documentation indicating that he was the owner and she accepted it and did not see a basis to pursue legal action. She also testified that the ownership of the mobile home was settled before she became Irene's guardian. She did not question whether these documents were false. Irene's sisters believe that Irene was taken advantage of and should have been the owner of the mobile home, and that Becky should have pursued legal action to establish Irene as the owner. Although Exhibit 4 shows that the Town of Brownington issues tax bills for the mobile home in the name of Irene and her husband Marvin, there was no evidence of actual ownership. She forwards the tax bills to the third party, who pays the taxes.

2

There was no evidence introduced to show that the third party's claim of ownership is invalid or that Irene has a superior claim. Appellants/Plaintiffs have not produced sufficient evidence to show that Becky had a duty to pursue ownership of the mobile home on behalf of Irene.

In 2018, two major developments occurred, both of which have continued to this day. Irene's dementia took a turn for the worse. Her short-term memory was not good, and she could not remember the necessary sign-ons and passwords to use her computer. Becky had to help her with those, and it affected her ability to communicate with her sisters by Facebook and computer. Her dementia has progressed steadily since then.

In May of 2018, three of Irene's four sisters filed the *pro se* Motion to Terminate or Modify Adult Guardianship in which they challenged Becky's fitness to serve as guardian and sought to remove Irene to Connecticut. Since that time, they have pursued this legal challenge to Becky as guardian, resulting in the hearing and need for decision now before the court.

Irene's medical provider was the Veteran's Administration facility in White River Junction, and in July of 2018, Becky took Irene for a medical appointment. The medical record documents that Irene's problems with memory and decision making had recently become worse. She had become unable to answer questions, and had reached a point such that Becky had to make sure she was supervised while eating, taking showers, and taking her medication. She could no longer do those things for herself. Becky provided such care and arranged for a home caregiver from Aries to care for Irene when Becky was working. Becky was Irene's social security payee, and the social security worker suggested to Becky that the monthly room and board payable to Becky should increase.

The sisters wished to have Irene move to Connecticut. An antagonistic relationship developed between Becky and the sisters. Becky did not trust the sisters and believed they were trying to influence Irene to go to Connecticut with them. The sisters did ask Irene if she wanted to come to Connecticut with them. She said she would have to ask Becky but nothing happened. The sisters believed that Becky was refusing to let them communicate with Irene. Irene's ability to use the computer and communicate by Facebook had deteriorated, and she often pushed buttons meaninglessly. She broke one computer, and then another, and Becky did not replace the second one. The result was an end to Facebook interaction between Irene and her sisters. They still had telephone calls. The sisters believed Becky was monitoring the phone calls. Becky testified that she did not listen to the calls once she had helped Irene get on the phone.

In the spring of 2019, the motion to terminate Becky as guardian was pending in Probate Court. Becky did not file an annual account that year and has not done so since. She testified that she did not realize she was supposed to as the Probate Court did not send her forms asking her to do so, which it had previously done, and she assumed that the annual accounts she provided to the social security office went to the Probate Court. By the second day of the hearing, she testified that she understood that she had to file separate accounts with the Probate Court and had obtained the forms and said she would do so. The court finds her failure to file accounts once the case was pending and forms were not sent to her was based on a misunderstanding and not neglect or mismanagement or intent to conceal.

3

In April of 2019, Attorney Clark, the sisters' lawyer, filed a Supplemental Motion on their behalf to remove Becky as guardian. They sought to have Irene's sister Louise appointed as guardian and in conjunction with that, also sought permission to change Irene's residential placement. The reasons advanced were that Becky allowed Irene to gamble, failed to pursue ownership of the mobile home, and did not provide a sufficient level of personal care given Irene's dementia and need to be supervised.

A hearing on the sisters' Motions was held in September of 2019, and the Probate Court denied the motions in October. The sisters filed an appeal, seeking a new hearing in this court.

In December of 2019, the sisters came to Vermont for a visit with Irene. They wanted to take her out to lunch on Saturday, and Becky agreed but required a chaperone to accompany them. All five sisters apparently had a pleasant time together. During the visit, the sisters asked Irene if she wanted to come to Connecticut to live with them. She was noncommittal. The plan was for a second outing on Sunday. Becky arranged for a chaperone for Sunday as well, but the sisters declined to have the visit if a chaperone was required and returned to Connecticut without seeing Irene on Sunday. Shortly after the visit, one of the sisters suggested to Irene on the phone, "maybe you'd like assisted living, like Mom." It is clear that the sisters were offering Irene the opportunity to express a desire to go to Connecticut with them and leave the care of Becky.

Both Marie and Louise acknowledge that they have asked Irene if she wanted to come to live with them. They testified that Irene answers that she would have to ask Becky. They interpret this as Becky's attempt to control her. The court finds that Irene is simply unable, due to her dementia, to engage in responsible decision-making. She loves her sisters but is also content to be dependent on Becky, and finds being put on the spot on that issue uncomfortable.

A status conference was held in January of 2020 in the Civil Division to plan for pretrial procedures and an evidentiary hearing. Shortly thereafter, Becky blocked the sisters from calling Irene at Becky's home. Becky testified that Irene asked her to do so because when she talked with her sisters on the phone, they upset her because they wanted to take her away. The sisters believe she did it to prevent communication. Becky acknowledges that she blocked calls to the home from them, but testified that thereafter she helped Irene make calls to the sisters when Irene wanted to do so. Other evidence corroborates that she did so.

In early 2020, the COVID-19 pandemic started, and Irene's activities outside the home had to stop. She no longer went to the Meeting Place, the adult day care facility she had been going to regularly. Becky's work as a substitute teacher stopped, and Becky provided Irene with care at home to keep her safe from the pandemic. The trips to casinos stopped, and none has occurred since. At a medical consultation in June of 2020, Becky was advised by Irene's doctor at the VA to keep her isolated to protect her from COVID-19, which Becky has done. Prior to the pandemic, Irene had attended church and church activities regularly with Becky and her husband. During the pandemic, they still attend church by driving to the church and listening to the service on the radio from the car.

In July of 2020, Gail Ruggles, an old friend of Irene's, stopped to visit and bring gifts. Although Becky was not keen on Ms. Ruggles entering Irene's private room, she did so, and out

of Becky's hearing asked Irene if she missed her sisters, to which Irene answered, "Oh, yes," and said she loved them and missed them. Ms. Ruggles thought that Irene's room was furnished so simply and sparsely that it was not as pleasant as it should have been, and that there were insufficient hygiene supplies.

The police have come to the home to check on Irene. According to Becky, they have "seen it's fine." Marie acknowledged that both she and another sister have contacted police to check on Irene. There is no evidence that as a result of those visits, any authorities have taken any action.

In the fall of 2020, Becky began working full time as a store cashier. She arranged for an in-home caregiver for Irene while she is at work. The expense is paid half by Becky and half from Irene's funds. Becky transferred $1,000 from Irene's regular bank account to a special savings account for burial expenses for Irene.

In January of 2021, Gail Ruggles arrived at the home to visit Irene while Becky was at work, and was summarily turned away by Becky's husband, who later took out a Notice Against Trespass against her. Ms. Ruggles feels that Irene is being kept too isolated, but she did not know that Irene's doctor had recommended to Becky that she prevent contact with others because of COVID-19. Becky arranged for Irene to be vaccinated against COVID-19, and Irene has recently had the second of two shots.

Although the sisters are blocked from calling, Irene has made phone calls to her sisters Louise and Rita in the last few months, with Becky's help in making the calls. In addition, Irene has had phone calls on her birthday and other holidays from cousins who are not blocked from calling her.

At this point, Irene has a pleasant affect, but virtually no ability to communicate meaningfully because of her dementia. She does not answer questions or participate in conversations, except to say yes. Neither her attorney nor her guardian ad litem was able to engage her in conversation. Becky says her communication has continued to decrease, and she talks a little but not a lot, even with her. Recently, fecal incontinence has become an increasing problem. She walks with a cane, and has had some falls. She needs someone with her at all times. She has no upper teeth, and no dentures. Becky testified that the reason she has not pursued dentures for Irene is that Irene hides things and throws them away, and she was concerned that Irene would do that with dentures so the expense would be wasteful.

Becky acknowledged on the first day of hearing that on some days, caring for her can be overwhelming, although not so on other days. On the second day of hearing, she acknowledged that it has come to the point when Irene needs nursing home care. She has investigated possibilities, and favors Maple Lane Nursing Home in Barton, because Irene is familiar with it, having worked there herself for several years. Becky plans to pursue this for Irene. The sisters are hoping to prevail in this case and would like to have Irene's sister Marie appointed as guardian. Marie testified that she would move Irene to Connecticut to stay with her sister Louise temporarily until she could be placed in a nursing home.

5

Over the 4 years that Becky has been Irene's guardian, she has provided safe in-home care for her during a period when Irene's mental condition has deteriorated seriously due to dementia and her physical condition has declined as well. Not only did Becky provide her with a home and progressively greater levels of personal care, but she also saw that Irene went to an adult day care facility, so that she had activities and connections with others, until the pandemic required that to stop. She also saw that Irene attended church and church suppers and took bus trips with her to casinos for recreational outings. Becky had to, and did, assume more personal care responsibility for Irene after her dementia worsened considerably beginning in 2018, and Becky also arranged for the full-time in-home supervision and care from others and Aries when she could not provide it herself.

Becky has maintained Irene's medical care and prescriptions through the VA, worked with Medicaid to obtain Medicaid services, and worked with the social security administration concerning Irene's income, which has now increased to $1,200 per month. She has managed Irene's funds and expenses and set aside burial expenses for her. Although no recent accounts have been filed with the Probate Court, the ones that were, together with other evidence, show that Becky has managed Irene's money responsibly and that all Irene's needs are being met out of her modest income. The court finds no evidence that money was squandered on gambling to Irene's detriment.

Becky took full responsibility for protecting Irene from COVID-19 during the last year, including keeping her safe in her home, even as Irene's needs for personal care grew much more demanding. COVID-19 hit nursing homes hard during the past year, so it is reasonable that Becky did not take steps sooner to place Irene in a nursing home. Becky had Irene get vaccinated against COVID-19 when that became available, and with Vermont's older population now having been largely vaccinated, and Irene having been recently vaccinated, placement in a nursing home facility has become a safer option than it was before.

The evidence shows that there are a few things Becky needs to do on Irene's behalf in the coming months: pursue dentures; find a suitable nursing home placement; and file accounts with the Probate Court for annual periods through the month of March in 2019, 2020, and 2021. Becky acknowledges these needs, and has testified that she plans to follow up. If she were not to do so, then there might be a basis for a finding that there was a change in the guardian's ability to serve in the role.

Becky also needs to improve lines of communication between Irene and her sisters and others so that Irene can, despite her dementia, maintain a sense of connection with people who have been important and close to her during her life. This might be hard for Becky, who has had to defend the challenge to her role pursued by the sisters over the last few years. Nonetheless, this court decision may help establish certainty about reality for everyone such that greater communication can take place in a manner in Irene's best interest. Hopefully, the outcome will remove the anxiety and uncertainty for Irene caused by not knowing what will happen to her and being in the middle between her sisters, whom she loves, and Becky, to whom she has been attached and on whom she has relied as a primary caregiver for several years. In addition, placement of Irene in a nursing home will provide the opportunity for the sisters and others,

6

including old friends in the community such as Gail Ruggles, to have contact with Irene at or through the home rather than at or through Becky's house or phone.

As of now, the court does not find a change in Becky's ability to serve as guardian. She has done a responsible job of providing a wide range of services and support for Irene over 5 years, personally and financially, despite unusual challenges including Irene's serious decline due to dementia, criticism from Irene's sisters and their pressure to remove her as guardian, and the pandemic and its effects on circumstances of care for Irene. If Becky follows through with the things that need to be done in the coming months, as she has said she will do and there is no reason to doubt her word, the evidence shows that she will remain capable of continuing to serve as Irene's guardian.

It is completely understandable that the sisters would like to take Irene to Connecticut to be near them and more family members. Irene is lucky that she has so many people who care for her and want to look after her. If something were to make Becky no longer able to be guardian, or if she were to decide to give up the role, the sisters have shown that they would be available and willing to assume responsibility for Irene. However, the question is whether Becky has become unsuitable, and the court finds that the evidence does not support the claim that Becky is no longer capable of serving as guardian. She has been meeting Irene's needs responsibly as guardian under very difficult circumstances for five years in the community in Vermont where Irene chose to stay after the death of her husband and is familiar to her.

### Conclusions of Law

Motion for Modification of Guardianship (Motion #8 in Probate Division)

14 V.S.A. §3077 provides in part as follows:

(a) A person. . .interested in the welfare of the person under guardianship may file a motion for termination or modification of the guardianship. Grounds for the termination or modification of the guardianship shall include:

. . .

(2) the failure of the guardian to file an annual report, or the failure to file such report in a timely manner;

. . .

(5) a change in the capacity or suitability of the guardian for carrying out his or her powers and duties, including any current or past expressed preferences of the person under guardianship to have an alternative person appointed as guardian.

7

These are the grounds on which the sisters seek removal of Becky Gale as guardian, and appointment of Marie Zinky.[1]

The record shows that Becky Gale did file annual reports for the first two years. While she did not do so after this litigation started, it is understandable for a few reasons: this litigation was pending, and the Probate Court did not send her the forms as it had done in the past. Also, she incorrectly believed that reports she filed with the social security administration went to the Probate Court. She has ordered the forms and intends to file the accounts. This combination of facts does not support removal, given that she filed timely accounts for the first two years before the litigation began and was under a misunderstanding and intends to file the missing accounts now. Moreover, there is ample evidence to support that her management of Irene's funds during the period of the missing accounts has been responsible. She will have the opportunity to file the missing accounts now.

The chief basis of the Motion for Modification from the beginning has been a claim that Becky is no longer suitable to serve as guardian because she took Irene gambling, failed to pursue ownership of the mobile home, and failed to provide sufficient care. The court has found above as a matter of fact that a change has not been proved and that Becky Gale has provided responsible and suitable personal and financial management and care throughout her time as guardian and continues to do so. The burden of proof has not been met. While there are challenges ahead that Becky must meet, she has stated a commitment to doing so, and there is nothing in the history of her service that suggests a reason for her not to have the opportunity to do so.

There are two things about the statutory requirements to note. First, it is clearly based on a policy of stability of the guardianship appointment. As long as the appointed guardian can serve responsibly, proposed alternatives cannot be considered. A petitioner seeking modification must meet a burden to show one of the specific changes identified in the statute, not simply offer an available opportunity. As with any matter in civil court, the burden must be met by a preponderance of the evidence. This structure assures the stability for the person under guardianship of not having to deal with periodic disruptions and instability.

Second, the statute does not specify that guardianship will automatically change when the person under guardianship expresses a preference for an alternative. If a person under guardianship expresses a preference, it may be part of proof of a change in the suitability of the guardian to continue, but a ward's expressed preference is not controlling. The statute describing the general rights of a person under guardianship, 14 V.S.A. §3068a, provides that the person has a "right to participate in decisions made by the guardian and to have personal preferences followed unless. . .the person under guardianship does not have a basic understanding of the benefits and consequences of his or her chosen preferences." 14 V.S.A. §3068a (1)(B). The evidence is clear that because of Irene's dementia, she cannot have sufficient understanding of

---

[1] Failure to file annual accounts was first raised as grounds for modification in closing argument at the hearing. At the time the original Motion was filed, all accounts due had been filed. Because the grounds did exist at the time of the hearing in the Civil Division, and it is pertinent to the issue of whether at the current time there has been a change in the suitability of the guardian, the court has considered it.

8

the benefits and consequences of a choice sufficient for any expressed preference to be well-considered and meaningful.

Moreover, the evidence does not show that Irene has ever expressed a preference for anyone other than Becky, whom she chose as a voluntary guardian. Since the guardianship became involuntary, the evidence does not show that she has expressed any preference and there is no evidence that she is not content to continue to rely on Becky. She clearly loves her sisters and misses them, but that does not rise to the level of expressing a preference for the role of guardian.

In sum, Irene has not expressed a preference, and it could not be controlling if she had. The sisters have not otherwise met the burden to prove by a preponderance of the evidence that there has been a change such that Becky Gale is no longer suitable to serve as Irene's guardian. Without such proof, and given the policy of stability of guardianship appointments, the sisters' Motion for Modification of guardianship must be denied.


## Motion for Change of Residential Placement (Motion #14 in Probate Division)

14 V.S.A. §3073 provides that a guardian who wishes to change the residential placement of a person under guardianship from a private home to a facility must file a motion for permission to do so. This motion was filed in the Probate Division in April of 2019, and would have been pertinent if the companion motion to remove Becky Gale and appoint Louise Schillinger (modified at the hearing to Marie Zinky) had been granted. Since modification of the guardianship appointment is not granted, this motion is moot. Becky Gale stated she was aware that if and when she seeks to move Irene to a nursing home, it is her responsibility to file a motion for permission to do so.

9

## Order

For the foregoing reasons,

1. The Motion for Modification of Guardianship by removing Becky Gale is *denied;*
2. The Motion for Change of Residential Placement is *moot;*
3. The deadline for Becky Gale to file accounts and reports through March of 2019, 2020, and 2021 in the Probate Division is April 23, 2021;
4. The Clerk shall provide a copy of this Decision to the Probate Division to be included in the case file for the Guardianship of Irene Pollard, Docket 51-2-16 Ospr; and
5. The case will be returned to the Probate Division for further administration of the guardianship.

Electronically signed pursuant to V.R.E.F. 9(d) on April 8, 2021 at 12:05 PM.

Mary Miles Teachout
Superior Court Judge

Benjamin Batchelder
Assistant Judge, Orleans County

Curtis A. Hardy
Assistant Judge, Orleans County

10